OPINION
{¶ 1} Larry V. Silver appeals from a Judgment Entry and Decree of Divorce entered by the Clark County Court of Common Pleas, Domestic Relations Division. Specifically, Mr. Silver objects to the court's custody determination and its valuation of his business. For the reasons that follow, the trial court's judgment will be affirmed. *Page 2 
 {¶ 2} Larry and Jennifer L. Silver were married in 1986, and two sons were born during their marriage. The boys were 16 and 14 years old at the time of the hearing on the complaint for divorce. Mr. Silver started a business during the marriage, Contractor Marketing, Inc. ("CMI"), which specialized in employee recruiting, advertising, publications, and general consulting. Mr. Silver was the sole shareholder of CMI, which was organized as a subchapter S corporation.
 {¶ 3} Mrs. Silver filed for divorce in 2003 and sought to be designated as the children's residential parent. She also sought spousal support, child support, and an equitable division of the parties' assets. A magistrate conducted a hearing on these matters over several days in the summer and fall of 2005. The magistrate found that Mrs. Silver should be designated as the residential parent. The magistrate also found that CMI was valued at $380,000, and that half of this amount, or $190,000, should be paid as a distributive award to Mrs. Silver. The trial court immediately adopted and ratified the findings and orders of the magistrate.
 {¶ 4} Thereafter, both parties filed objections to the magistrate's decision. Although the court made some corrections of typographical errors, it overruled the parties' objections to the substance of the magistrate's decision.
 {¶ 5} Mr. Silver appeals, raising two assignments of error.
 "THE TRIAL COURT ABUSED ITS DISCRETION BY AWARDING CUSTODY OF BOTH CHILDREN TO APPELLEE-WIFE BECAUSE IT IS IN THE BEST INTERESTS OF BOTH CHILDREN TO RESIDE WITH APPELLANT-HUSBAND"
 {¶ 6} Mr. Silver contends that the trial court abused its discretion in naming Mrs. *Page 3 
Silver as the residential parent because of her documented physical and mental abuse of the children, the children's desire to live with him, and his positive and stable relationship with the children. He claims that the trial court's attitude toward him was capricious.
 {¶ 7} The trial court considered extensive testimony about the parties' relationships with their children, including testimony from the children themselves. The testimony from Christopher, the older son, revealed that he was angry about the divorce but that he loved both of his parents. He tended to fight with his mother about punishments and limitations that she imposed on his behavior, and he admitted that he had precipitated or initiated some physical altercations between them. The younger son, Nathan, cared more about living with his brother than with a particular parent. Nathan also described fighting with his mother over discipline. Mrs. Silver believed that the boys wanted to live with Mr. Silver because she was firm on discipline and because Mr. Silver lived in the family's large and comfortable house with a newly finished basement filled with games and a flat-screen television. Mrs. Silver described the new recreation room in Mr. Silver's basement as a "dream room for teenagers." She contrasted the living arrangements at the family home with the two-bedroom apartment in which she was living, where the boys did not have their own rooms or lots of games, and they had only a basic television.
 {¶ 8} Mrs. Silver and her witnesses testified that she was a good mother with a loving relationship with her children. They also described very controlling behavior on Mr. Silver's part, including demands that she pray and make certain admissions before visitation. (Mr. Silver was the residential parent while the divorce was pending.) Mrs. Silver denied that she had been drinking, partying, or having sexual relationships while the divorce was pending. *Page 4 
Family members described Mr. Silver's emotional abuse of Mrs. Silver and expressed fear that the abuse could become physical. They also stated that the boys' relationships with their father were based on fear.
 {¶ 9} Mr. Silver's friends testified that he had a good relationship with his children and that he was the better parent, although they had very limited exposure to the children's interaction with their mother. Mr. Silver's witnesses were familiar with the religious "fellowship" in which he was deeply involved and stated that the children were not afraid of him. They testified that Mr. Silver was a man of God, and one of the witnesses expressed her belief that the father is always the better parent to provide a secure environment for children. Mr. Silver testified that neither child was afraid of him, that he did not think either boy was comfortable or happy living with his mother, and that he wanted to keep the boys living with him in the family home to provide stability for them. A guardian ad litem was appointed and provided reports to the court. The guardian ad litem concluded that the physical altercations between Christopher and his mother were not significant for purposes of his recommendation. He also concluded that the children would express a desire to live with either parent "depending on who resides in the marital home." The guardian ad litem described Mr. Silver as "a controlling manipulative person who is highly inflexible" and who used visitation in his attempts to alter Mrs. Silver's behavior toward him. The guardian ad litem concluded that Mrs. Silver would be the better residential parent and would better facilitate visitation.
 {¶ 10} The magistrate agreed with the guardian ad litem that it was in the children's best interest to designate Mrs. Silver as the residential parent because Mr. Silver was "domineering" and Mrs. Silver was more likely to facilitate visitation. The magistrate found that Mr. Silver's *Page 5 
alleged desire to reconcile and "forgive" his wife was not genuine and was focused on winning custody. The magistrate noted that Mr. Silver had been found in contempt of court twice during the divorce proceedings for harassing Mrs. Silver. Quoting a decision of the same court granting civil protection orders to the parties during the pendency of the proceedings, the magistrate stated:
 {¶ 11} "When reviewing the testimony of [Mr. Silver] one would get the impression that he is cool, calm[,] logical and in control. In reality [Mr. Silver] is controlling and manipulative and very absolute in his thinking. Apparently, [Mr. Silver] feels that he is entitled to chide and correct [Mrs. Silver] and often points out that there is much room for improvement in her behavior as wife and mother. * * * [Mr. Silver's] harassment and constant referral to the bible and the biblical ills that will befall [Mrs. Silver] if she continues with the divorce have clearly placed her in fear of imminent physical harm * * *. * * * It is clear that [Mrs. Silver] is a timid person, who has not been sure of herself for a long time, but is beginning to assert herself. Not surprisingly she is married to a demanding spouse who often affirms he is right about a lot of things. And he has displayed a condescending attitude toward almost everyone involved in these cases."
 {¶ 12} The trial court re-adopted the magistrate's recommendation over Mr. Silver's objections.
 {¶ 13} A trial court's determination regarding parental rights should be given great deference and will not be disturbed on appeal absent an abuse of discretion. Miller v. Miller (1988), 37 Ohio St.3d 71, 74,523 N.E.2d 846. In our view, the trial court did not abuse its discretion in designating Mrs. Silver as the residential parent. The older son, Christopher, *Page 6 
admitted to provoking and instigating the physical contact described by Mr. Silver as "abuse" out of anger over being deprived of his use of a cell phone or internet as punishment. The guardian ad litem was confident that these incidents were not "abusive." By the time of the hearing, these types of behaviors seemed to have subsided, and Mrs. Silver felt that the boys were treating her with more respect.
 {¶ 14} More importantly, the trial court found Mrs. Silver's temperament and personality to be more conducive to her children's well-being and to the facilitation of visitation. Mr. Silver's controlling behavior, which appears to have been based largely on his religious beliefs, was well established, and the trial court was obviously concerned about it. The court also could have reasonably concluded that Christopher's stated preference for living with his father was based, in substantial part, on his desire to live in the family's home, because the parties and the children agreed that the living conditions were much more comfortable there.
 {¶ 15} Considering all of the factors set forth in R.C. 3109.04(B) and discussed in the magistrate's decision, it is clear that the trial court did not abuse its discretion in concluding that the children's best interests were served by designating Mrs. Silver as the residential parent.
 {¶ 16} The first assignment of error is overruled.
 {¶ 17} "THE TRIAL COURT'S OVER-VALUATION OF APPELLANT-HUSBAND'S BUSINESS, CONTRACTOR MARKETING, INC., CONSTITUTED AN ABUSE OF DISCRETION."
 {¶ 18} Mr. Silver contends that the trial court used an inaccurate method to assess the value of his business for the purpose of distributing marital assets and determining his income. In essence, Mr. Silver objects to the fact that the court credited the testimony of Mrs. Silver's *Page 7 
valuation expert over that of his own expert.
 {¶ 19} The magistrate exercised "heightened scrutiny" in determining Mr. Silver's income because it recognized that, as the sole shareholder of the company, Mr. Silver could "control distribution and retention of the net profits of the business" and that there was "the possibility of manipulation of income."
 {¶ 20} Mr. Silver's income had been growing in recent years, and the magistrate recognized that using his average income over several years would result in a significantly different amount than using his income for the most recent year. For example, Mr. Silver's average income for 2001, 2002, and 2003 was $94,439, whereas his income in 2004 was $145,975. Based on "his current income trend," the magistrate found that the 2004 income was a more reliable predictor of Mr. Silver's 2005 income than an average of previous years. The magistrate also recognized that a share of future net income might be needed for capital expenditures, but it noted that Mr. Silver did not offer any evidence to indicate the amount of funds that might be needed for investment in the future. Moreover, the experts seemed to agree that the business was not capital-intensive. Based on this evidence, the magistrate's conclusion that $145,975 represented Mr. Silver's income for support calculations was a reasonable one.
 {¶ 21} We now turn to the valuation of CMI. CMI was a subchapter S corporation that was formed during the marriage and was marital property. The parties presented competing expert testimony regarding its value as of December 31, 2004. Daniel Lewis, Mrs. Silver's valuation expert, testified that the business was worth $380,000; Alan Duvall, Mr. Silver's expert, testified that the business was worth $59,000 with goodwill and $13,000 without goodwill. *Page 8 
 {¶ 22} The magistrate discussed the two valuation methods at length and favored the valuation method used by Lewis. He cited several reasons for this preference, including Lewis's avoidance of factors generally used in the valuation of publicly-traded companies. The magistrate also agreed with Lewis's view that a buy-sell agreement entered in 2004 was credible evidence of the fair market value of the company. The buy-sell agreement valued 100% of the CMI stock at $400,000. In the magistrate's opinion, there was no evidence that this was not a fair market value transaction. Furthermore, the magistrate discussed at length how certain key numbers or percentages could significantly effect the valuation of a business. The magistrate concluded that Lewis had provided a better explanation for the numbers he used than Duvall had. The magistrate's detailed explanation of his conclusions regarding the valuation of CMI are supported by the record. Based on the evidence presented, we cannot conclude that the trial court abused its discretion in determining the amount of income attributable to Mr. Silver for purposes of support calculations or in valuing CMI for purposes of a distributive award to Mrs. Silver.
 {¶ 23} The second assignment of error is overruled.
 {¶ 24} The judgment of the trial court will be affirmed.
 FAIN, J. and DONOVAN, J., concur. *Page 1