[Cite as *In re T.M.M.*, 2017-Ohio-9219.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | CASE NO. 17 CO 0025 |
| | ) | |
| T.M.M., | ) | |
| DOB: 11/28/02, | ) | OPINION |
| | ) | |
| T.D.M., | ) | |
| DOB: 6/15/04. | ) | |
| | ) | |

CHARACTER OF PROCEEDINGS:    Civil Appeal from the Court of Common
Pleas Juvenile Division of Columbiana
County, Ohio
Case No. P2004-0299-1 & -2

JUDGMENT:                                      Affirmed.

APPEARANCES:

For Plaintiff-Appellant:                     Atty John D. Falgiani, Jr.
P. O. Box 8533
Warren, Ohio 44484

For Defendant-Appellee:                  Atty Albert A. Palombaro
4822 Market St.
Youngstown, Ohio 44512

JUDGES:

Hon. Carol Ann Robb
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated:  December 21, 2017

ROBB, P.J.

**{¶1}** Appellant Brian McCormack ("the father") appeals the decision of the Columbiana County Common Pleas Court, Juvenile Division, denying his motion for shared parenting and his motion to hold Appellee Jennifer Lease ("the mother") in contempt for interfering with his parenting time. The father contends the court's failure to implement a remedy addressing his youngest child's refusal to visit him effectively deprived him of all parenting time with the child. He takes issue with various findings made by the court, including whether the mother should have been held in contempt and whether shared parenting was in the children's best interests. For the following reasons, the trial court's judgment is affirmed.

STATEMENT OF THE CASE

**{¶2}** The parties have two children: Child A, born in 2002, and Child B, born in 2004. In 2007, the father filed a petition to recognize a parental relationship, establish parental rights and responsibilities, and formalize parenting time. An agreed entry established parenting time in an amount no less than the local standard schedule, which granted parenting time to the nonresidential parent every other weekend plus a midweek visit one week and two midweek visits the next week. (9/18/07 J.E.) The midweek visits were terminated during the school year by an agreed entry in 2009, and the standard schedule was reinstated in 2013. (6/15/06 J.E.); (9/13/13 J.E.) The midweek parenting time was reduced to one day a week in 2014. (8/5/14 J.E.)

**{¶3}** On August 5, 2016, the mother filed a motion to modify the father's parenting time. She sought to eliminate the midweek visit, claiming it interfered with school work and extracurricular activities, partly due to travel time from their house in Salem to the father's house in Poland. The mother also filed a motion to show cause against the father, alleging issues with summer parenting time and phone access.

**{¶4}** On the day the motions were to be heard, September 9, 2016, the father filed a "motion to modify the current allocation of parental rights and companionship" to shared parenting; he stated there were substantial changes of circumstances due to his new, less-demanding work schedule and described the

current plan as disjointed. His proposed shared parenting plan sought alternating weeks of parenting time. He filed a motion to modify child support to reflect his desired additional time with the children. The father also filed a motion to show cause against the mother, alleging she manipulated the children's schedule to prevent his exercise of parenting time, interfered with communication, and refused to communicate with the father except by letter. As to Child B (who was twelve years old), the father also claimed the mother refused to require this child to visit with him.

{¶5} On the day the cross-motions were to be heard, in November 2016, the case was continued for the appointment of a guardian ad litem. The hearing proceeded before a magistrate on February 21, 2017. The mother testified she did not work as she was receiving permanent total workers' compensation for a back injury. The children live with her and her boyfriend, whom she described as fulfilling the role of a step-father for the children. The children have relatives living in the vicinity of her house. The mother acknowledged she and the father communicated poorly; she believed he did not listen when they talk and would not allow her to speak, even when she called about a simple issue. (Tr. 39). She used letters for most communication with the father.

{¶6} She did not consent to the father's shared parenting plan and opined it would be "too much of a hassle" for the children. For example, Child A stayed after school most days for weight-lifting, but the father's plan proposed he would pick up Child B from school during his week and wait until Child A was done with his activity. (Tr. 42). She believed even the midweek visit (during the school year) was hard on the children due to their schedules. (Tr. 11-12). Child A was about to begin baseball which would be followed by football. (Tr. 9-10, 13). Child B would have soccer in the summer and fall and talked about starting basketball thereafter. (Tr. 13). The mother pointed out that the father lives 40 to 45 minutes from the children's school. (Tr. 14). The father confirmed this estimate and said he would drop them off and pick them up at school on his way to and from work in Steubenville (from his home in Poland). Although the children live five minutes from their school, the father believed the children spent 30-35 minutes on the bus to school. (Tr. 62).

**{¶7}** The mother disclosed Child B began resisting visits with the father around Christmas of 2015. At that time, she said she spent three days talking Child B into spending the holidays with his father. She called the father to explain the delicate situation and lamented the father's refusal to listen to her while he complained about his own hurt feelings. (Tr. 32, 39). When the father was exercising two weeks of summer parenting time in June, the mother said the police assisted her in retrieving the children so she could exercise time with Child B on his birthday. Child B resisted returning to the father's house despite the mother's requests; however, her boyfriend was able to convince the child to return for the summer parenting time. (Tr. 26).

**{¶8}** When asked what she has done about Child B's refusal to visit, which began in July 2016, the mother said: "I have called the Sheriff's Department, nobody will get involved. They will not force the kid out of the car. I cannot get the kid to go. I have talked to him. I have pleaded with him. Nothing." (Tr. 36-37). The mother testified she never told the child he did not have to visit but rather encouraged him to visit his father. (Tr. 40-41). She said her boyfriend also tried to convince Child B to visit with the father. (Tr. 31). The mother testified the child has many reasons for his refusal that have "built up." She was unaware of some of the child's reasons, opining he is "holding in" some issues. (Tr. 41). She knew about other reasons, including: a threat to return the child's basketball hoop and keep his birthday money; money missing from the child's wallet; a threat to "bash his teeth in" after the child was disrespectful; the father said the mother failed to provide the child proper footwear in front of other parents; flea bites; animal waste in the child's bed; the girlfriend told the child about court proceedings involving her child's father; the girlfriend accused the mother of lying; they suggested they would put the mother in jail; the girlfriend's daughter scratched the child's neck; and the girlfriend's daughter threw a piece of wood at him causing a bruise on his back. (Tr. 32-33).

**{¶9}** The father lived with his girlfriend, who had shared parenting of her eleven-year-old daughter (one week on and one week off). They lived in a three bedroom, one bathroom rental house in Poland Village. His family did not live in the

area. The father changed branches at his employment (from Pittsburgh to Steubenville) and stated his workload was reduced and can be partly performed at a local office or at home. (Tr. 110). The father and his girlfriend disputed knowledge of many of the issues outlined by the mother as to Child B. The father testified that he has been unable to exercise parenting time with Child B since he brought the child home on July 8, 2016.

{¶10} He explained an argument which occurred as they were leaving his house that day: the father's girlfriend asked why Child B appeared to be "hiding" outside; she demanded the child hand over his phone and his iPod as they were entering the vehicle; the child refused to relinquish his iPod; the father declared he would look at anything he wanted on the child's electronic devices; the father instructed the child not to bring the device back to the father's house; the father advised the child he would not be granted access to his phone when he returned; and the father indicated he would be returning the basketball hoop they just purchased with the child's birthday money. (Tr. 54-55).

{¶11} Although the father's visits with Child A (who was 14 years old) were uninterrupted, Child B refused to return and would hang up the phone if the father tried to call him. (Tr. 60). He noted Child A seemed to enjoy the individual time with him for the first several months after Child B stopped visiting. (Tr. 77).

{¶12} The father sought shared parenting as he wanted more time with the children and believed his plan would eliminate petty issues and provide stability. (Tr. 63, 76). He said the parents would not have to meet for transfer because one parent would get the children to school Monday morning and the other would pick them up at school Monday afternoon. (Tr. 76). As discussed further infra, the father mentioned counseling for him and Child B, acknowledging he did not file a motion seeking counseling. The father also stated the guardian ad litem tried to arrange for him to meet with Child B the prior week but the child refused. (Tr. 94, 97).

{¶13} The guardian ad litem testified she tried to resolve the situation with Child B, but he would not "budge" or discuss the situation. When she asked whom he would speak to about the situation, the child indicated he would talk to the judge.

(Tr. 149). He repeated this when she tried to arrange dinner with the father, and she then explained to him it would be a magistrate. (Tr. 154). She did not believe the mother exercised undue influence over the child regarding the situation. (Tr. 150-151, 161, 163). After she explained the father's shared parenting plan to the children, they voiced they did not want to switch to shared parenting (as it would be "too much") but agreed with the current schedule (which included every other weekend and one midweek visit). (Tr. 155-157). The guardian ad litem recommended the current court-ordered schedule as well. (Tr. 156). The father's attorney asked if she believed counseling with the child and the father would be appropriate, and she responded in the affirmative. (Tr. 151). The magistrate then invited the attorneys to remain for the in camera interview with the children. (Tr. 165).

{¶14} On March 24, 2017, the magistrate's decision was released, setting forth various findings and conclusions. The court adopted the Magistrate's decision as its own entry the same day. The court denied the mother's motion to eliminate the father's midweek parenting time and the father's request for shared parenting. The court concluded the mother should remain the residential parent and found shared parenting and/or a designation of the father as residential parent was not in the children's best interests. The court also denied both parties' motions to hold the other in contempt. The court advised the parties to strictly comply with the prior parenting time order.

{¶15} The father filed timely objections. He contested: the mother's testimony that she "pleaded" with Child B to visit his father; the failure to make findings on what Child B said during the in camera interview as to why he refused to visit the father; the denial of the father's motion for contempt against the mother; the failure to implement a remedy such as reconciliation counseling; the finding that the mother is more likely to facilitate visitation; the failure to find changed circumstances due to the child's refusal to visit; the failure to find it would be in the children's best interests to change to shared parenting; and the cumulative claim that this all resulted

in a de facto elimination of parenting time with Child B. On July 13, 2017, the trial court overruled the father's objections.

## ASSIGNMENT OF ERROR

**{¶16}** The father sets forth one assignment of error:

"THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN EFFECTIVELY TERMINATING APPELLANT'S PARENTAL RIGHTS CONTRARY TO LAW."

**{¶17}** In framing the issue presented, the father claims the court's decision maintains the status quo which in actuality means he will not be able to exercise parenting time with Child B because this child has refused to attend the visits. The father sets forth multiple arguments about the decision on his motions. The trial court denied two motions filed by the father: a motion to show cause asking to hold the mother in contempt and a motion to reallocate parenting time to shared parenting.

**{¶18}** The trial court's decision on contempt is not to be disturbed in the absence of an abuse of discretion. *State ex rel. Celebrezze v. Gibbs*, 60 Ohio St.3d 69, 75, 573 N.E.2d 62 (1991). Likewise, a reviewing court will not overturn the trial court's decision on custody, whether an initial allocation or a modification, unless the trial court abused its discretion. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418-419, 674 N.E.2d 1159 (1997); *Pater v. Pater*, 63 Ohio St.3d 393, 396, 588 N.E.2d 794, 797 (1992). An abuse of discretion exists if the trial court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). A decision is unreasonable if it is unsupportable by any sound reasoning process. *See AAAA Ents., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990) (abuse of discretion review typically involves a determination of whether a decision was unreasonable). "When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court." *In re Jane Doe 1*, 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181 (1991).

**{¶19}** We begin with the argument that the court erred in denying the father's motion for contempt against the mother based upon his allegation the mother willfully

withheld or otherwise prevented parenting time between the father and Child B. He discounts the mother's testimony that she "pleaded" with Child B to visit the father.

{¶20} The mother's testimony on this topic was set forth supra: she expended great effort to change the child's mind when he first wanted to stop visiting the father; she failed a few months later when the child refused again; her boyfriend talked the child into returning for the father's summer parenting time after his birthday; when this parenting time concluded with an argument between the child and the father's girlfriend and between the child and the father, the child adamantly refused to visit the father; the mother said she pleaded with him; she said she did not discourage the child from visiting the father but rather encouraged him to accompany his brother on the visits; she unsuccessfully asked the police for help removing the child from her car; and her boyfriend tried to convince the child as well. Both parents have refrained from resorting to dragging the child from the mother's car to the father's car. The guardian ad litem opined the child's decision was not a result of improper influence on the mother's part. We also note Child A, who is two years older than Child B, attended all visits in satisfaction of the father's court-ordered parenting time.

{¶21} The mother's credibility was a matter within the province of the fact-finder. *See Davis*, 77 Ohio St.3d at 418-419 ("This is even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well."). "[T]he trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Id.* at 418. The trier of fact "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony" and the appellate court "should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court." *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80-81, 461 N.E.2d 1273 (1984). It was not unreasonable, unconscionable,

or arbitrary to refuse to hold the mother in contempt for the twelve-year-old child's refusal to cooperate in the parenting time transfer.

{¶22} Next, we address the argument that the magistrate, after conducting the in camera interview of Child B and finding the child refused to visit his father, should have explained why Child B refused to visit the father. The statute applicable to the allocation of parental rights, whether initial or modification proceedings, provides:

> In determining the child's best interest for purposes of making its allocation of the parental rights and responsibilities for the care of the child and for purposes of resolving any issues related to the making of that allocation, the court, in its discretion, may and, upon the request of either party, shall interview in chambers any or all of the involved children regarding their wishes and concerns with respect to the allocation.

R.C. 3109.04(B)(1). *See also* R.C. 3109.051(C) (in determining parenting time). If the court interviews a child: "The court, in its discretion, may and, upon the motion of either parent, shall appoint a guardian ad litem for the child." R.C. 3109.04(B)(2)(a).

{¶23} "The interview shall be conducted in chambers, and no person other than the child, the child's attorney, the judge, any necessary court personnel, and, in the judge's discretion, the attorney of each parent shall be permitted to be present in the chambers during the interview." R.C. 3109.04(B)(2)(c). *See also* R.C. 3109.04 (B)(3) ("No person shall obtain or attempt to obtain from a child a written or recorded statement or affidavit setting forth the child's wishes and concerns regarding the allocation of parental rights and responsibilities concerning the child.")

{¶24} "If the court determines that it would be in the best interests of the child to determine the child's wishes and concerns with respect to the allocation, it shall proceed to make that determination." R.C. 3109.04(B)(2)(b). Compare this to the preceding sentence in R.C. 3109.04(B)(2)(b): "If the court determines that, because of special circumstances, it would not be in the best interest of the child to determine the child's wishes and concerns with respect to the allocation, it shall not determine the child's wishes and concerns with respect to the allocation and shall enter its

written findings of fact and opinion in the journal." From this, it has been concluded, a trial court is not required to issue findings of fact pertaining to an in camera interview unless the court decides not to determine the child's wishes and concerns with respect to the allocation. *Donovan v. Donovan*, 110 Ohio App.3d 615, 619, 674 N.E.2d 1252 (12th Dist.1996)

{¶25} The statutory best interest test for allocating parental rights includes the following factor: "If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court * * *." R.C. 3109.04(F)(1)(b). The next factor concerns the interaction and interrelationship with certain individuals. See R.C. 3109.04(F)(1)(c). Addressing this factor, the magistrate found Child B refuses to visit or be involved with the father. Elsewhere, the magistrate found the relationship between the father and Child B "is clearly estranged at this point." Referring to R.C. 3109.04(F)(1)(b), the magistrate determined, "Both children wished to continue to live with their mother under the current arrangement." The court thus made a determination of the child's wishes from what the magistrate learned at the in camera interview. The attorneys were invited to stay for the interview; whether they accepted the invitation is unknown.

{¶26} The in camera interview is considered confidential. As the father's brief points out, this confidentiality is bolstered by a local rule. Pursuant to Columbiana County Juvenile Court Rule 9.7, the record or transcript of the in camera interview "shall be sealed, to be opened only by the Court or upon order of the Court." The local rule also states: "Attorneys may have access to the transcript of the child's interview only upon written motion and judgment entry signed by the Court" and "The parents shall have no access to the report of the interview, even if the record has been transcribed for purposes of appeal or objections."

{¶27} If the trial court explained in detail the reasoning behind the child's wishes expressed at the interview, confidentiality could be negatively affected. The father is seeking any details the magistrate learned about why Child B refused to visit

him. Citing confidentiality principles surrounding the in camera interview and the resulting transcript, the Fifth District overruled a party's argument that "the magistrate and the trial court erred and abused their discretion by failing to make specific findings of fact developed in the in-camera interview of the parties' minor children and in sealing the record of the proceeding * * * *." *Lawson v. Lawson*, 5th Dist. No. 13-CA-8, 2013-Ohio-4687, ¶ 51-58. *See also Myers v. Myers*, 170 Ohio App.3d 436, 2007-Ohio-66, 867 N.E.2d 848, ¶ 46-55 (reviewing other districts). Similarly, the Twelfth District overruled an argument about a sealed in camera transcript where it was claimed "the parties were not put on notice of any accusations made" by the children during the in camera interview. *Willis v. Willis*, 149 Ohio App.3d 50, 2002-Ohio-3716, 775 N.E.2d 878, ¶ 15 (12th Dist.).

**{¶28}** Although the court may reveal the child's choice of residential parent, "all confidentiality from the in camera interview is not lost or illusory." *Chapman v. Chapman*, 2d Dist. No. 21652, 2007-Ohio-2968, ¶ 28. *See also Nentwick v. Nentwick*, 7th Dist. No. 96-JE-27 (Feb. 18, 1998) (rejecting an argument about a sealed transcript of an in camera interview). The magistrate did not abuse its discretion in failing to detail what was learned from Child B during the in camera interview, besides his preference that he remain living with his mother under the current arrangement.

**{¶29}** The father's brief also suggests the trial court should have conducted its own in camera interview of the children, citing *Schottenstein v. Schottenstein*, 10th Dist. No. No. 00AP-1088, 2001-Ohio-3987. An in camera interview is only mandatory upon request of a party. R.C. 3109.04(B). This requirement is satisfied when a magistrate conducts the interview; this is the nature of the magistrate's position. *See* Juv.R. 40(C)(1)-(2) (juvenile court magistrates are authorized to determine any motion in any case and to conduct the trial of any case that will not be tried to a jury {with the exception of a serious youthful offender case} and to do everything necessary for the efficient performance of those responsibilities). *See also* Civ.R. 53. The father's objections did not ask the trial court to subject his children to another in camera interview. *Compare Schottenstein*, 10th Dist. No. 00AP-1088 (where the

children, who were named as parties, and the mother objected to the magistrate's custody decision and requested the trial judge to conduct his own interview of the children and where additional evidence arose after the magistrate's hearing).

**{¶30}** "Whether or not objections are timely filed, a court may adopt or reject a magistrate's decision in whole or in part, with or without modification. A court may hear a previously-referred matter * * *." Juv.R. 40(D)(4)(b) (or return a matter to a magistrate or take additional evidence[1]). The decision to hear a previously-referred matter is discretionary with the court. *See, e.g., Snyder v. Snyder*, 8th Dist. No. 95421, 2011-Ohio-1372, ¶ 39; *Noe v. Noe*, 5th Dist. No. 07-COA-047, 2008-Ohio-1700, ¶ 17. There is no indication a subsequent in camera interview was required or would have been useful in ruling on the objections presented in this case. Contrary to the father's argument, the trial court was not required to sua sponte hold its own in camera interview in this previously-referred matter.

**{¶31}** On his shared parenting request, the father asserts Child B's refusal to visit him for a continuous and extended period of time constituted a sufficient change of circumstances to justify a modification of parental rights. Initially, we observe the father's motion to modify the allocation of parental rights to shared parenting said the change of circumstances was his new flexibility in employment; nevertheless, the contempt request in the same motion alleged the mother was refusing to require the child to attend visitation, and there was testimony on the child's refusal to visit for many months.

**{¶32}** The court made the following notable statements: (1) "whether or not any change in circumstances can be found in the present case, which the Court does not find, the best interests of [the children] requires that the mother remain their residential parent and legal custodian and that the father's request for shared parenting be denied"; and (2) "Even if a change of circumstances can be found, which this Court does find, modification is not in the best interests of these children

---

[1] In ruling on objections, "the court may hear additional evidence but may refuse to do so unless the objecting party demonstrates that the party could not, with reasonable diligence, have produced that evidence for consideration by the magistrate." Juv.R. 40(D)(4)(d).

as demonstrated by analysis of the factors [referring to prior analysis] * * * In any event, shared parenting is not in the children's best interests." (3/24/17 J.E. at 10-11).

**{¶33}** First, we note the conflict between the two clauses as to whether the court found changed circumstances; one says "does not find" and one says "does find." Second, we note the court specifically made an alternative holding denying the father's request "whether or not any change in circumstances can be found" due to the court's decision on the children's best interests.[2] If shared parenting is not in the children's best interests, then changed circumstances would not assist the father's cause. This leads to the father's next argument contesting the court's finding that shared parenting was not in the children's best interests and/or it was in the children's best interests to designate the mother as the residential parent.

**{¶34}** But first, we must point out the need to apply the changed circumstances test was also made as an alternative holding. Although the father proceeds as though this is a modification of parental rights subject to the stricter changed circumstances test, the trial court expressed uncertainty as to whether this proceeding would be considered a modification since there was no prior court order specifically allocating parental rights and responsibilities to the mother. As the court pointed out, the mother was the residential parent and legal custodian by operation of a statute, which provides: "An unmarried female who gives birth to a child is the sole residential parent and legal custodian of the child until a court of competent jurisdiction issues an order designating another person as the residential parent and legal custodian." R.C. 3109.042(A) (also stating, "A court designating the residential parent and legal custodian of a child described in this section shall treat the mother and father as standing upon an equality when making the designation.").

---

[2] In a modification case, the court cannot change a prior decree allocating parental rights unless there are changed circumstances, the modification in the child's best interest, and the court finds: (i) the residential parent agrees or both parents under a shared parenting decree agree; (ii) the child, with the consent of the residential parent or both parents under a shared parenting decree, has been integrated into the family of the person seeking to become residential parent; or (iii) the harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child. R.C. 3109.04(E)(1)(a). The court found none of these options apply here. (3/24/17 J.E. at 7).

**{¶35}** Where the mother is the residential parent under this statute and no prior court order designates her as such, the father's request for allocation of parental rights is considered an initial request rather than a request for modification of a prior decree. *In re J.K.,* 7th Dist. No. 14 CA 899, 2014-Ohio-5502, ¶ 26. Although prior entries provided the father visitation or companionship (now called parenting time), the entries did not specifically designate the mother as the residential parent. This court has previously concluded such a scenario (involving a prior court order granting the father's companionship request and a subsequent request by the father for "reallocation of parental rights") still qualifies as an initial allocation. *See In re S.S.L.S.,* 7th Dist. No. 12 CO 8, 2013-Ohio-3026, ¶ 6, 15-16.

**{¶36}** In any event, as aforementioned, the trial court specifically made an alternative holding as to the children's best interests. The court ruled shared parenting was not in the children's best interest and the children's best interests require the mother remain the residential parent. The father contests the trial court's weighing of the best interest factors in reaching this conclusion. Specifically, he contends the court abused its discretion in finding the mother was "more likely to honor and facilitate parenting time rights or visitation and companionship rights." The father urges shared parenting would promote continuity and bonding. He complains the mother flatly rejected his proposed plan without articulating convincing reasons.

**{¶37}** "In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to" those listed in R.C. 3109.04(F)(1)(a)-(j). These factors must also be considered in considering shared parenting under R.C. 3109.04(F)(2), along with additional factors provided in division (F)(2). The court reviewed some of the testimony presented at the hearing. The court then made findings with regard to the statutory factors it found pertinent on the issue of the children's best interests.

**{¶38}** The court set forth the wishes of the parents regarding the children's care. *See* 3109.04(F)(1)(a). The court disclosed the children's wishes as to the

allocation of parental rights and responsibilities, stating they both wished to continue to live with their mother under the current arrangement and they both "want to continue the current parenting and companionship arrangement." *See* 3109.04(F)(1)(b). As to the children's interaction and interrelationship with parents, siblings, and any other person who may significantly affect the children's best interests, the court found: Child A "enjoys a good relationship with both of his parents and their respective paramours and their extended families"; Child B "enjoys a good relationship with his mother and her paramour. However, [he] refuses to visit or be involved with his father"; and the children are "well bonded" and enjoy a good relationship with each other. *See* 3109.04(F)(1)(c). On this topic, the court noted the estranged relationship between the father and Child B weighs against the proposal for the child to live with the father every other week and it would be inappropriate to separate the children further (for instance, by granting shared parenting as to only Child A). The court found both children were well adjusted to their home, school, and community, noting the children's involvement in their school district socially and academically. *See* 3109.04(F)(1)(d). Mental and physical health was not "a significant issue when it comes to the ability to parent these children." *See* 3109.04(F)(1)(e).

{¶39} As criticized by the father, the court found the mother was the parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights. *See* 3109.04(F)(1)(f). Still, the court did not find a continuous and willful denial of court-ordered parenting time by either parent, characterizing many of the parenting time complaints as "petty squabbles." *See* 3109.04(F)(1) (other relevant factors can be considered), (F)(1)(i) (continuous and willful denial by the residential parent). Contrary to the father's contention, these two findings are not contradictory. In other words, the court was not required to state the father continuously and willfully denied the mother time in order to believe the mother was more likely to honor and facilitate court-approved parenting time.

{¶40} The court found the factor regarding failure to make required child support payments was inapplicable. *See* 3109.04(F)(1)(g). The next factor, involving

certain conviction or adjudications, was also found to be inapplicable. *See* 3109.04(F)(1)(h). The court did not find either parent has established a residence, or is planning to establish a residence, outside this state. *See* 3109.04(F)(1)(j).

**{¶41}** As to the additional shared parenting best interest factors, the court pointed out the parents have no ability to communicate, cooperate, or make decisions jointly with respect to the children. *See* 3109.04(F)(2)(a). The court "doubt[ed]" the father's ability to encourage the sharing of love, affection, and contact between the child and the mother. *See* 3109.04(F)(2)(b). The court found inapplicable the factor regarding a history of abuse, domestic violence, or parental kidnapping. *See* 3109.04(F)(2)(c). The geographic proximity of the parents was considered impractical as it related to the proposed shared parenting plan due to the distance of the father's house to the school (45 minutes one way). *See* 3109.04(F)(2)(d). The court also pointed out the guardian ad litem did not recommend shared parenting. *See* 3109.04(F)(2)(e).

**{¶42}** There is no indication the court abused its discretion in denying the father's motion for shared parenting. The decision is not arbitrary or unconscionable; nor is it unsupportable by any sound reasoning process. *See AAAA Ents.*, 50 Ohio St.3d at 161. The credibility of the parties and other witnesses was a matter for the trier of fact as there may have been "much evidence in the parties' demeanor and attitude that does not translate to the record well." *See Davis*, 77 Ohio St.3d at 418-419 (fact-finder had opportunity to view the witnesses and observe their demeanor, gestures and voice inflections and to use these observations in weighing credibility). The father's argument as to shared parenting is overruled.

**{¶43}** Finally, we reach what appears to be the father's main overarching argument. The father complains the court declined to implement a remedy to address the Child B's refusal to visit him and states the court's inaction permits a child to thwart a court order of parenting time. He asserts it was an abuse of discretion to not formulate some type of relief, such as an assessment of the child, counseling, reconciliation counseling with the father and the child, or supervised visitation. He characterizes the court's denial of his motion for shared parenting and

his motion for contempt against the mother as maintaining the status quo (which involves Child B refusing to visit him). The father concludes the failure to order some relief effectively deprived him of his parenting time with Child B and could be viewed as the termination of his parental right to visitation.

**{¶44}** The father's brief then outlines the following law applicable when a court considers whether to terminate a parent's visitation: modification of visitation is within the discretion of the trial court upon considering the best interest factors in R.C. 3109.051(D); the nonresidential parent has a fundamental and natural right to visitation; the child has a fundamental right to visit with the nonresidential parent; the parent contesting visitation has the burden to show extraordinary circumstances by clear and convincing evidence; and the burden then shifts to the other parent to show visitation is still in the child's best interest. *See Dubec v. Pochiro*, 7th Dist. No. 09-MA-6, 2010-Ohio-1293, ¶ 21-26. In *Dubec*, this court found the trial court effectively terminated visitation rights when it eliminated all visitation, even though the court provided some telephone contact. *Id.* at ¶ 29. We remanded and held: "when a trial court terminates a nonresidential parent's right of visitation the court must make a finding in its judgment entry that there was clear and convincing evidence of extraordinary circumstances justifying termination of those rights." *Id.* at ¶ 31.

**{¶45}** The father concludes the court was required to utilize this law in determining the motions before the court in this case. However, the mother did not ask the court to terminate his parenting time, and the court did not terminate his parenting time. In fact, the court denied the mother's motion to decrease his parenting time, wherein she asked to eliminate the mid-week visit (and keep the visit every other weekend and the additional summer weeks). The father filed a motion for shared parenting and a motion to hold the mother in contempt. Contrary to the allegations in his brief, the denial of these motions was not a denial of parenting time.

**{¶46}** The court denied shared parenting based upon the children's best interests and the refusal to hold the mother in contempt for Child B's failure to visit was apparently based upon the belief she did not improperly influence the child to refuse and she sufficiently encouraged him to visit. (The propriety of these decisions

was addressed supra.) The denial of the father's motions was not an attempt to eliminate the father's right to visit with Child B. Furthermore, in denying the parties cross-motions for contempt, the court warned each party "to strictly comply with the Court's order of companionship as previously ordered." The prior order of companionship was every other weekend and every Wednesday for both children, with the other accoutrements of the local standard order.

{¶47} As to the failure to implement a plan (such as an evaluation or assessment and then counseling) to encourage Child B to visit the father, the mother's response brief contends the father cannot complain the court failed to enter an order where he did not file a motion seeking the order he now demands. She concludes the court fully addressed the motions filed and the father is seeking relief regardless of whether his motions were properly denied. She states the father can still seek counseling to facilitate his parenting time with Child B if he files a proper motion and the court finds the particular request is in the child's best interest.

{¶48} The father acknowledged his motion did not seek the type of remedy which he now suggests was required in order for the court to avoid abusing its discretion. His combined motion (for contempt and for shared parenting) did not seek an evaluation or counseling and he did not file a motion to modify his parenting time to occur at counseling (or under supervision as his brief also suggests). He underscores what he calls a "generic" request at the end of his motion for relief in the form of "[s]uch other and further Orders as are just." He also suggests counseling was mentioned at the final pretrial; however, the February 3, 2017 transcript of the pretrial contains no mention of a supplemental request for an evaluation or counseling.

{¶49} An assessment or evaluation is often used to ascertain the propriety, function, and scope of any future counseling. The statute governing the allocation of parental rights provides:

> Prior to trial, the court may cause an investigation to be made as to the character, family relations, past conduct, earning ability, and financial worth of each parent and may order the parents and their minor

children to submit to medical, psychological, and psychiatric examinations. The report of the investigation and examinations shall be made available to either parent or the parent's counsel of record not less than five days before trial, upon written request. The report shall be signed by the investigator, and the investigator shall be subject to cross-examination by either parent concerning the contents of the report. The court may tax as costs all or any part of the expenses for each investigation.

R.C. 3109.04(C). This statutory language on ordering a psychological examination "is advisory and not mandatory in nature." *Stone v. Stone*, 9 Ohio App.3d 6, 11, 457 N.E.2d 919, 924 (12th Dist.1983). *See also Weaver v. Weaver*, 5th Dist. No. 2003CA00096, 2004-Ohio-4212, ¶ 55-56 (finding the trial court did not abuse its discretion when it denied a party's motion under this division in part because the party waited until after the middle of the divorce hearing to file a request for psychological evaluations and also noting the children were already in counseling).

{¶50} In all the time the case was pending prior to the hearing (and throughout the continuances on the dates of the schedule hearings), no motion requesting an assessment or reconciliation counseling was filed. We emphasize the language "[p]rior to trial" in the above statute. The failure to order an evaluation prior to trial does not appear unreasonable, in this case, where no request was made for such an order. *See, e.g., In re S.M.K.*, 2d Dist. No. 2008 CA 17, 2008-Ohio-6733, ¶ 15-21.

{¶51} As for the court's obligation to order an assessment and/or counseling after the hearing, the father emphasizes the portions of his testimony referring to counseling. Notably, his first mention of counseling occurred while he was being cross-examined. He was asked whether he agreed with the mother's opinion on Child B having unvoiced issues concerning his refusal to visit. The father answered: "Yes I want counseling. I have already told my attorney I want counseling between me and [Child B] so we can work these problems out because obviously there is something going on." He added, "Well we didn't make a motion for that but I would

definitely love to have that happen." (Tr. 94). On redirect examination, his attorney asked if he was willing to undergo counseling with the child, to which the father replied, "Absolutely. If that is what it would take. * * * I want to work on our issues." (Tr. 115). No details on counseling were discussed. The mother believed the child had unexpressed issues with the father; however, she was not asked about the topic of counseling for the child. The father's closing argument did not mention counseling.

**{¶52}** The trial court was not unreasonable in failing to order the mother to deliver the child to counseling where the filed motions before the court were all denied. The father did not file a written motion for counseling or for modified visitation (with a request for an order for the mother to bring the child to counseling). There was no evidence presented on the specifics of the counseling requested, and no evaluation had been conducted before trial. Under the circumstances in this case, we discern no abuse of discretion. Appellant's assignment of error is overruled, and the trial court's judgment is affirmed

Donofrio, J., concurs.

Waite, J., concurs.